UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MELVIN JONES,

    Plaintiff,

v.                                            Case No. 22-C-653

GEORGE DILLENBERG, et al.,

    Defendants.

# DECISION AND ORDER DENYING DEFENDANTS'
# MOTION FOR SUMMARY JUDGMENT

      Plaintiff Melvin Jones, an inmate at the Green Bay Correctional Institution (GBCI), is representing himself in this 42 U.S.C. §1983 action. He is proceeding on an Eighth Amendment claim based on allegations that Defendants George Dillenberg, Montrel Bridges, James Elsinger, Jason Phillips, and Brandon Banker ignored his statements that he had suicidal thoughts and that he was going to cut himself with a razor. On May 5, 2023, Defendants moved for summary judgment. For the reasons explained below, the Court will deny Defendants' motion.

## BACKGROUND

      At the relevant time, Jones was an inmate at GBCI, where Defendants worked as corrections staff. On March 3, 2022, Jones was housed in the restrictive housing unit (RHU) on Clinical Observation Status due to a mental health incident. RHU is a separate unit within the institution where inmates can be held apart from the general population and where movement, behavior, and/or privileges are more restricted. Clinical Observation Status is for inmates who may be a danger to themselves. As a result of his status, Jones was on close observation, meaning

that staff performed a visual check on him at staggered intervals not to exceed fifteen minutes. Jones' cell was also equipped with an emergency intercom button as well as in-cell cameras.

At about 3:30 p.m., Dillenberg, Bridges, Banker, and Elsinger were actively engaged with Inmate Barrett in the cell next to Jones' cell. Barrett, who was on a hunger strike, refused to remain on his feet and walk to the Health Services Unit (HSU) for a health check and demanded that he be provided a wheelchair. After repeated requests that he get back on his feet and struggling to get him off the floor, the officers brought a transport chair to his cell, restrained him in it, and wheeled him around the corner to the HSU. When they arrived at the HSU, Barrett refused to speak with the medical staff and he was then placed on control status, which required that he be strip searched in a separate cell. After he was removed, Bridges and Elsinger cleaned the prisoner's cell. Barrett was then safely moved back to his cell. Dkt. Nos. 42, 43, 63 at ¶¶ 1–7, 9–18.

According to Defendants, while Dillenberg, Bridges, Banker, and Elsinger were engaged in placing Barrett in a transport chair, Jones attempted to get their attention by yelling that he had a razor blade and was threatening to cut himself. On the video evidence submitted by Defendants, Jones can be heard mocking the defendants and saying in a calm tone of voice that the time is 3:37 and naming the defendants in the hallway who were attempting to restrain Barrett in a transport chair. Exhibit 1012 at 4:40–6:20. When they returned him to his cell, Jones can still be heard and Barrett comments that Jones is cutting himself and bleeding. One of the officers, presumably Defendant Dillenberg responds, "Right now, I'm dealing with you," and Barrett replies, "I don't care." Exhibit 1014 at :40–50. As the defendants continue to struggle trying to get Barrett to comply with their directions, Jones can be heard calling out that he's cut himself, swallowed two razors, and is bleeding from an open wound on his left arm. *Id.* at 4:08–50. Less than two minutes

2

later, Dillenberg summarizes the interaction with Barrett, notes that there were no injuries and states that the time is 4:08 p.m. *Id.* at 5:35–6:25.

In essence, the defense position seems to be that those who were dealing with Barrett did not believe Jones had a razor blade. They claim they never saw a razor blade or found one in his cell. Dillenberg concedes that he briefly engaged with Jones while Barrett was being removed from his cell. According to Dillenberg, Jones said he wanted to be placed in bed restraints and showed him an object, which Dillenberg did not believe was a razor blade. As Jones called out his threats of self-harm while they were moving Barrett out of his cell and to the HSU, Dillenberg states he told Jones to "grow up" because Dillenberg believed he was acting immaturely. Dkt. No. 42, ¶¶ 21–23.

Defendant Elsinger likewise concedes that he briefly engaged with Jones while they were dealing with Barrett but did not believe that Jones was in possession of a razor blade because such items are not allowed in Observation Status. Elsinger states he simply told Jones that he was busy in response to his demands that they come to his cell. Defendant Bridges likewise did not interrupt his involvement with Barrett in response to Jones' claims that he had a razor and was going to harm himself and denies making any comments to Jones. *Id.* ¶¶ 24–27. Defendant Banker states that he continued to check Jones at fifteen-minute intervals even during the disturbance caused by Barrett's refusal to walk to HSU. He contends that Jones made no statements about harming himself or having a razor blade at 3:30 or 3:45 p.m. At 4:00 p.m., however, Jones said he had a razor blade and was feeling suicidal. He also showed Banker a cut on his left arm but did not show him a razor blade and was not actively harming himself at that time. Banker claims he then left Jones' cell to alert his supervisor, since he could not enter alone under institutional policy due to safety concerns. *Id.* ¶¶ 31–36.

3

Defendant Phillips, who was in the RHU Control Center, claims that he first became aware that Jones was threatening himself at 4:08 p.m., when Jones pushed his emergency call button. Phillips states that he checked the camera in Jones' cell and could see blood on Jones' arm. Phillips states that Jones never showed him a razor blade, but he immediately called for officers to report to Jones' cell. Correction Officers Michael Jean and Zakary Korpita proceeded to Jones' cell. By 4:15 p.m., Banker's log shows that Jones was in HSU and at 4:34 p.m., he was being treated for his injury by non-defendant nurse Rachel Matushak. *Id.* ¶¶ 37–48. Jones was treated for a 1.5 cm laceration to his left arm, which was cleaned, closed with three steri-strips, and bandaged. Jones told Nurse Matushak that he had engaged in self-harm because no one was listening to him. The wound reopened when Jones was being placed in bed restraints and a new bandage and steri-strips were applied. According to Nurse Matushak, the wound was small in size and had a slight amount of bleeding. No additional treatment beyond cleaning and bandaging the wound was necessary. *Id.* ¶¶ 49–52.

Finally, a medical program assistant states that some six months later she supervised a record review for Jones. Jones was looking for specific records from a March incident in which he injured himself. When the assistant asked Jones why he harmed himself, Jones responded that he really wasn't going to self-harm; he just wanted attention. *Id.* ¶¶ 69–72.

Jones' version of the facts is somewhat different. According to Jones, while the incident with Barrett was ongoing, he repeatedly called out that he was having thoughts of suicide and was actively cutting himself. Specifically, Jones asserts that, after his neighbor had been removed from his cell, he informed Officer Sullivan (who is not a defendant) that he had a razor blade and that he intended to kill himself unless he was stopped. Jones states that after he showed Sullivan the razor blade, Sullivan radioed Dillenberg, who came to Jones' cell. Sullivan told Dillenberg about

4

the razor blade and then continued with medication pass. Jones states that he informed Dillenberg that he had found a razor blade and he was going to cut himself if he did not get help. Jones states that Dillenberg responded as he walked away, "Yeah yeah yeah you and three (3) other guys." Jones asserts that he called out that he was going to attempt suicide, to which Dillenberg said, "Grow up." Dkt. Nos. 63 at ¶¶21-2; 1 at ¶¶19–25.

Jones states that, after Dillenberg walked away, he pressed his emergency call button for the first time and told Phillips to check the camera because he was about to cut himself. Jones asserts that he then showed the razor blade to the camera and started cutting himself. According to Jones, at that time, Banker was conducting a fifteen-minute check. Jones states that at 3:30 p.m. he showed Banker the razor blade and the inside of his arm, and Banker responded, "I'm not doing anybody else['s] job," and walked away. Dkt. Nos. 63 at ¶¶31–32; Dkt. No. 1 at ¶¶26–28.

Jones also asserts that, around this time, while Bridges and Elsinger were cleaning his neighbor's cell, he yelled to them that he was cutting himself and they should come to his cell, to which Bridges responded, "Jones get off your bullshit" and Elsinger responded, "We're busy." Dkt. Nos. 63 at ¶¶24; Dkt. No. 1 at ¶¶30–33; Dkt. No. 46 at ¶¶10–13. At 4:08 p.m., Jones states he again pushed his emergency call button and that by this time there were multiple pools of blood on his floor. Dkt. Nos. 63 at ¶¶33–51, 60–61; Dkt. No. 62 at 5.

As to the extent of his injury, Jones claims blood was gushing out of his arm and that there were multiple pools of blood in his cell. Dkt. No. 63-1 ¶¶ 25, 26. When Officers Jean and Korpita finally arrived and removed him from his cell, he claims he was light-headed and trailed blood all the way to HSU. The HSU staff wrapped a towel around his arm to stop the bleeding while he waited for the nurse to arrive. *Id.* ¶¶ 29, 30. Referencing medical and physical therapy records, Jones claims that he continues to suffer pain, numbness, tingling, and reduced range of motion as

5

a result of his self-inflicted injury. *Id.* ¶ 52 (citing Exhibits A, B1, B2, C1–11) When Nurse Matushak asked him why he cut himself, Jones states that he told her that he "repeatedly asked for staff help and they all ignored me leaving me to act on my suicidal thoughts." *Id.* ¶ 32. As for whether he actually had a razor blade, Jones states that when Lieutenant Lannoye came into the bed restraint room to check Jones' range of motion, he spit the razor blade into Lannoye's hand. *Id.* ¶ 37. And finally, in response to the report of the medical program assistant who said Jones told her he really wasn't going to self-harm; he just wanted attention, Jones claims he told her that if prison staff had helped him, he would not have harmed himself. *Id.* ¶ 72.

Defendants argue they are entitled to summary judgment on the merits and, alternatively, under the doctrine of qualified immunity.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an

6

element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Jones' claim is that Defendants violated his constitutional rights by failing to prevent him from harming himself. The claim is predicated on the well-established principle that deliberate indifference on the part of prison officials to a serious risk of harm to inmates, whether due to injury/illness or other inmates, constitutes cruel and unusual punishment within the meaning of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825 (1994). It is easy to understand why deliberate indifference to harm from which an inmate is unable to protect himself because of his incarceration should subject correctional officers or staff to liability for resulting harm. It is less clear, however, why correctional officers should be held liable for harm the inmate deliberately causes to himself. *See Taylor v. Wausau Underwriters Ins. Co.*, 432 F. Supp. 2d 882, 889 (E.D. Wis. 2006) ("One could reasonably argue, it seems, that denying liability for inmate suicide in the absence of evidence of mental illness or other incapacity is more consistent with the rationale underlying the deliberate indifference doctrine, and the language and history of the Eighth Amendment. To hold otherwise would also seem to be permitting a prisoner 'to engineer an Eighth Amendment violation,' something the Seventh Circuit has explicitly cautioned against." (quoting *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005))). Also, such a rule can create perverse incentives for enterprising inmates. *See Goodvine v. VandeWalle*, No. 16-C-890, 2018 WL 460121, at *7, 9 (E.D. Wis. Jan. 17, 2018) ("Goodvine admitted in the course of his testimony that he has successfully sued jail and/or correctional officers on a number of previous occasions for failing to prevent him from harming himself and related claims, and has recovered at least $25,000 in settlements with the State.").

7

But, in *Miranda v. County of Lake*, the Court of Appeals rejected the defendant county's challenge to the rule that its jail could be liable for failing to prevent an inmate from harming herself, explaining that incarcerated persons are "deemed incompetent." 900 F.3d 335, 349 (7th Cir. 2018). For this reason, the court held, "[w]e repeatedly have recognized a jail or prison official's failure to protect an inmate from self-harm as one way of establishing deliberate indifference to a serious medical need." *Id*. The idea that incarcerated persons are incompetent is, of course, a legal fiction. Persons suffering from severe mental illnesses that render them incompetent to stand trial or not responsible for criminal conduct are not sentenced to prison. Wis. Stat. §§971.14, 971.15. Moreover, if Jones had assaulted a guard or another inmate with a razor blade, there is little doubt he would be lawfully charged with battery by a prisoner. He would not be deemed incompetent merely because he is a prisoner.

In *Freeman v. Berge*, the court offered a series of alternative reasons for the rule imposing civil liability on prison officials for a "sane suicide":

> The reasons are practical. (No longer does one hear that prisoners must not be allowed to evade punishment by killing themselves and thus "cheating the gallows.") If prisoners were allowed to kill themselves, prisons would find it even more difficult than they do to maintain discipline, because of the effect of a suicide in agitating the other prisoners …. The idea behind liability in such cases is that incarceration can place a person under unusual psychological strain and the jail or prison under a commensurate duty to prevent the prisoner from giving way to the strain.

441 F.3d 543, 546–47 (7th Cir. 2006).

Of course, if prisoners deliberately harming themselves causes disruption, that would be a reason for punishing such conduct, not rewarding it by imposing liability on guards. And while incarceration can create unusual strain on inmates, the rule imposing liability on guards for failing to promptly respond to an inmate's threat of self-harm empowers inmates and allows them to manipulate often overworked guards and prison staff. *See Bowers v. Pollard*, 602 F. Supp. 2d 977,

993 (E.D. Wis. 2009) ("It is difficult to imagine any institution on earth, penal or not, that could or would be expected to expend as much time, effort and resources to protect a person from himself. Indeed, it is the prison staff's very concern for Bowers' physical safety that, in his mind, gave him so much power over them."). Such manipulation can be seen in the video evidence submitted by Defendants in this case. *See* Exhibits 1012–1014. Regardless, the rule imposing liability on prison guards and staff for deliberate indifference to the risk of an inmate harming himself is well-established, *Miranda*, 900 F.3d at 349, at least by the Court of Appeals, and it is that law on which Jones' claim is based.

Still, while a prison official's deliberate indifference to a prisoner's substantial risk of serious self-harm violates the Eighth Amendment, not every claim by a prisoner that he did not receive adequate protection will succeed. *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012). To prevail on such a claim, a plaintiff will have to provide evidence showing that Defendants (1) were aware of an objectively serious risk of harm to him; and (2) knowingly or recklessly disregarded it. *Szopinski v. Koontz*, 832 F. App'x 449, 451 (7th Cir. 2020) (citations omitted).

Defendants first argue that they are entitled to summary judgment because Jones fails to develop evidence of a recoverable injury in that his physical injury consisted only of a minor, superficial scratch that was easily treated with a bandage. In support of their argument, Defendants rely on *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020), in which the court held that that plaintiff's claim failed because minor scratches failed to show that he experienced a cognizable harm. In *Lord*, the inmate plaintiff drew the attention of a female correctional officer while he was masturbating in his cell. When the officer told him he would receive a conduct report for his behavior and walked away, the plaintiff shouted that he had a razor blade and was going to kill himself. Another guard heard the plaintiff say that he would kill himself if he was not able to talk

9

with the female guard. About thirty minutes later, another guard saw a couple of droplets of blood on the plaintiff's cell door window. The razor blade was confiscated, and the plaintiff was taken to a different cell where medical personnel applied a gauze bandage to the few minor scratches they saw on the plaintiff's forearm. *Id.* at 904. Claiming that four correctional officers were deliberately indifferent to the substantial risk of serious harm, the plaintiff brought suit under § 1983.

In affirming the district court's summary judgment dismissing the case, the Court of Appeals concluded that the plaintiff's claim failed because he did not show he experienced any cognizable harm. The court explained:

> Lord's physical injuries consisted only of minor scratches, quickly and easily treated with a gauze bandage. By any measure, the injuries were trivial—indeed, almost nonexistent—and Lord supplied no evidence that he suffered any other form of injury (for example, psychological harm) from his insincere suicide threat. Lord's summary judgment papers show that he wanted to recover money damages solely for the risk to his life—a serious medical need—the defendant officers ignored by not immediately responding to his suicide threat. That risk is not compensable without evidence of injury, however. Put most simply, the summary judgment record revealed and left nothing for Lord to present to a jury at trial.

*Id.* at 905. Defendants contends that like Lord's, Jones' injuries were trivial and superficial, reflecting the fact that his threat was insincere and that he just wanted attention. Because the harm he sustained was not serious, Defendants argue his claim fails.

Defendants' argument is not without merit. If Nurse Matushak is believed, then Jones suffered only a minor, 1.5 cm cut to his left arm that required no treatment beyond cleaning and a bandage. *See Mayville v. Demers*, Case No. 20-C-310, 2020 WL 6136129, * 2 (E.D. Wis. Oct. 19, 2020) (holding that 1.5 cm wound does not constitute serious medical condition necessary to show deliberate indifference). But Jones has offered evidence in the form of his own declaration and medical reports that the injury was more serious. He claims that there were pools of blood

10

from the cut and that he continues to suffer pain and other symptoms for which he is receiving medical treatment and physical therapy. An injury that produces so much blood can hardly be characterized as "minor" or "trivial" or "superficial." The court cannot determine from the record who is telling the truth, and thus summary judgment cannot be granted on the ground that Jones did not experience a cognizable harm.

Defendants next argue that they are entitled to summary judgment because they did not actually know that Jones posed an imminent risk of harm to himself. But the facts upon which their argument is predicated are sharply disputed by Jones and the opposing declarations he offers. Dkt. No. 63-1. For example, Dillenberg asserts that he did not believe Jones had a razor blade, nor did he believe that Jones intended to harm himself given Jones' refusal to hand over whatever object he had in his hand. Elsinger and Bridges assert that they were engaged in other duties and did not see the razor blade that Jones claimed he had. And Banker and Phillips contend that, once they observed blood on Jones' arm, they both responded quickly to secure help. But Jones offers a very different account of Defendants' responses to his threats of self-harm.

With regard to Dillenberg, Jones asserts that another officer informed Dillenberg that he had seen a razor blade in Jones' possession and that Jones both showed Dillenberg the razor blade and informed Dillenberg that he intended to cut himself with it. Dillenberg asserts that he did not believe the object Jones showed him was a razor blade, but whether Dillenberg refused to address Jones' threats because he believed the object was something other than a razor blade and because he believed Jones' threats of self-harm were not sincere is a matter for the jury to decide. *See, e.g.*, *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (holding that whether the doctor refused to treat plaintiff on a good-faith belief that plaintiff was malingering is an issue for the jury). In short, if a jury believes Jones' version of his interactions with Dillenberg, it could reasonably

11

conclude that Dillenberg was deliberately indifferent to the risk of serious harm that Jones posed to himself. Accordingly, Dillenberg is not entitled to summary judgment on the merits.

Similarly, Elsinger and Bridges assert that, although they heard Jones yelling that he had a razor blade, neither of them engaged with him because they were busy cleaning his neighbor's cell. But, although "no prisoner is entitled to insist that one employee do another's job," *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009), corrections staff are not free to ignore threats of serious and imminent harm simply because they are performing their daily duties. Jones asserts that he told Elsinger and Bridges that he was cutting himself and they should come to his cell to see. A jury could reasonably conclude that their failure to pause cleaning his neighbor's cell to confirm Jones's statements or radio for another officer to check on Jones demonstrated deliberate indifference to the serious risk Jones posed to himself. Elsinger also explains that, because Jones was on observation status and not allowed to possess a razor blade, he did not believe that Jones actually had a razor blade. But lots of items that are not allowed in prisons are frequently and inexplicably accessible to prisoners. Thus, once again, whether Elsinger did not respond because he believed Jones was not being truthful about cutting himself is for the jury to decide.

Finally, Phillips and Banker assert that they are entitled to summary judgment on the merits because they both quickly secured help for Jones once they noticed blood on his arm. Jones tells a different story. According to Jones, he showed Banker the razor blade and was actively cutting himself at 3:30 p.m., not 4:00 p.m. as Banker contends. Dkt. No. 63, ¶ 32. Jones also contends that he pushed his emergency call button and showed the razor blade to Phillips via his in-cell camera shortly after Dillenberg walked away from his cell, but Phillips did nothing. Jones states that it was not until he pushed his emergency call button a second time about half an hour later that Phillips told officers to respond to Jones' cell. Jones states that by this time, several pools of

blood could be observed on the floor. Jones also asserts that two different times he showed Banker the razor blade and Banker observed Jones cutting his arm, but Banker did nothing. Further, Banker states that he left Jones' cell to inform a supervisor, but it was not until after Jones pressed his emergency call button at 4:08 p.m. that officers responded to Jones' cell. As Jones points out, it is not clear why Banker did not remain at Jones' cell and radio for help or why it took so long after Banker observed Jones for officers (at Phillips' request) to arrive at Jones' cell.

The video evidence pertaining to Jones' claim might have allowed the court to resolve these factual disputes without a trial. But GBCI claims that it lost that video evidence. Dkt. No. 39. As a result, the court is confronted with two separate accounts. Were a jury to believe Jones' version rather than the defendants' versions, it could reasonably conclude that they were deliberately indifferent to the serious risk of harm Jones posed to himself. Accordingly, Phillips and Banker, as well as the other defendants, are not entitled to summary judgment on the merits.

Alternatively, Defendants argue they are entitled to summary judgment under the doctrine of qualified immunity. Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a court reviews a defendant's motion for summary judgment based on qualified immunity, the court considers "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether the constitutional right was clearly established at [that] time." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (citing *Pearson*, 555 U.S. at 232); *Estate of Clark v. Walker*, 865 F.3d 544, 549–50 (7th Cir. 2017).

Here, as noted above, an inmate's right to be free from deliberate indifference to his risk of self-harm was clearly established at the time Jones cut himself.  *See Miranda*, 900 F.3d at 349 ("We repeatedly have recognized a jail or prison official's failure to protect an inmate from self-harm as one way of establishing deliberate indifference to a serious medical need.").  And for the reasons already explained, the evidence viewed in the light most favorable to Jones would allow for a jury to find in his favor.  Under these circumstances, Defendants are not entitled to qualified immunity.  *Chilcutt v. Santiago*, No. 22-2916, 2023 WL 4678583, at *3 (7th Cir. July 21, 2023) ("[A] district court properly denies a motion for summary judgment based on qualified immunity when the facts, viewed in the light most favorable to the plaintiff, create a genuine dispute about whether the defendants' actions violated a clearly established constitutional right.") (citing *Estate of Clark v. Walker*, 865 F.3d 544, 551 (7th Cir. 2017)).  Defendants' motion is therefore denied on that ground as well.

## NEXT STEPS

Because Defendants are not entitled to summary judgment, Jones' claims will proceed to trial.  Given the difficulty of trying a case before a jury, including offering a coherent opening statement and closing argument, presenting and examining witnesses, and locating and introducing evidence, the Court concludes that Jones lacks the capacity to represent himself in the next stage of litigation.  Accordingly, the Court will make efforts to recruit a volunteer lawyer to represent him.  The demand for volunteer lawyers is high, but the supply is low.  Few lawyers have the time, ability, or experience to volunteer for cases such as these.  The Court encourages Jones to be patient as it makes efforts to recruit a lawyer to represent him.  The process may take some time.  The Court will promptly notify Jones in the event a lawyer volunteers to represent him.  In the meantime, the Court encourages the parties to explore whether settlement is possible.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 40) is **DENIED**.

**SO ORDERED** at Green Bay, Wisconsin this 25th day of August, 2023.

> s/ William C. Griesbach
> William C. Griesbach
> United States District Judge